# EXPERT REPORT OF BRUCE G. SILVERMAN

*SHARON CROWDER, JOEL LUMIAN, ROBERT SMITH,*
*AMANDA GOLDWASSER, and MARK ELKINS,*
*each individually and on behalf of all others similarly situated,*

*Plaintiffs,*

*v.*

*THE SHADE STORE, LLC,*

*Defendant.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Case No. 5:23-cv-2331-NC

AND

*LEE FITZGERALD and KATHERINE ADLER,*
*individually and on behalf of all others similarly situated,*

*Plaintiffs,*

*v.*

*THE SHADE STORE, LLC,*

*Defendant.*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
Case No. 2:23-cv-01435-RSM

*January 23, 2025*

**<span style="color:red">CONTAINS CONFIDENTIAL AND HIGHLY CONFIDENTIAL INFORMATION</span>**

SILVERMAN CONSULTING LLC
3168 DONA MEMA PLACE  STUDIO CITY CA 91604
TEL: 323-654-7659;  MOBILE 310-200-7670
BRUCESILVERMAN1@GMAIL.COM
WWW.BRUCESILVERMANCONSULTING.COM

# CONTENTS

I. Introduction ................................................................................................ 2

II. Qualifications ........................................................................................... 7

III. Summary Of Opinions ............................................................................ 16

IV. Advertisements Featuring Price-Off Messages Play An Important Role In The Customer Purchase Decision Process ............................................................... 18

V. Consumers View Sales As Time-Limited Or Avaialbility-Limited And This Plays An Important Role In Consumer Purchasing Decisions ........................................ 24

VI. Customers Are More Likely To Purchase An Item If They Think They Are Getting A Good Percentage Off The Regular Price ......................................................... 29

VII. Defendant's "Sale" Claim Would Be Important To A Reasonable Consumer In Deciding Whether To Purchase One Or More Of Defendant's Products ......................... 35

VIII. It Is Probable That A Significant Portion Of Defendant's General Consuming Public, Acting Reasonably In The Circumstances, Would Be Misled By Its Promotional Messaging ................................................................................................... 37

IX. A Reasonable Customer Would Rely On The Veracity Of Defendant's Price-Off Messaging, i.e., That The Sale Price Is Truly Less Than The Regular Price ................... 43

Exhibit "A" .................................................................................................. 46

Exhibit "B" .................................................................................................. 49

Exhibit "C" .................................................................................................. 67

# I. INTRODUCTION

1.      My name is Bruce G. Silverman. I am an advertising expert retained by Counsel for Plaintiffs as an expert witness in connection with the matters styled *SHARON CROWDER, JOEL LUMIAN, ROBERT SMITH, AMANDA GOLDWASSER, and MARK ELKINS, each individually and on behalf of all others similarly situated, Plaintiffs, v. THE SHADE STORE, LLC, Defendant*, which is pending in the United States District Court, Northern District Of California, Case No. 5:23-cv-2331-NC, and *LEE FITZGERALD and KATHERINE ADLER, individually and on behalf of all others similarly situated, Plaintiffs, v. THE SHADE STORE, LLC, Defendant*, which is pending in the United States District Court, Western District of Washington, Case No. 2:23-cv-01435-RSM.

2.      According to Plaintiffs' Third Amended Class Action Complaint,[1] "Defendant The Shade Store, LLC ('The Shade Store' or 'Defendant') makes, sells, and markets window covering products and accessories, including but not limited to, blinds, shades, and drapes ('The Shade Store Products' or 'Products'). Defendant maintains a public website where it advertises the Products and their prices. Consumers who visit the website can purchase the Products through an online store hosted on the website. Alternatively, consumers can request an in-home measurement or price quote through the website in various ways, including through a pop-up window that appears when consumers visit the homepage; through 'Chat' or 'Email' buttons on the top of the homepage of the website; through a 'chat' feature that appears in the bottom right-hand corner of the website; or by clicking the 'consult' or 'quote' button on the website. In each of these

---

[1] Based on my review of the operative complaints in the California and Washington actions, I understand that the allegations regarding Defendant's conduct in the two cases are materially similar. For convenience, I cite to Plaintiffs' Third Amended Class Action Complaint in the California case, but my opinions apply equally to the Washington case.

situations, consumers are assigned and ultimately receive a price quote and purchase Products from Defendant through 'Expert Design Consultants' employed or contracted by Defendant. Alternatively, consumers can call the toll-free number listed on Defendant's website or visit one of Defendant's 'Showrooms' (advertised on Defendant's website) and receive price quotes and make purchases in that manner."[2]

3.    Defendant prominently advertises on its website purported time-limited sales that apply to all of its products. These included "LIMITED TIME" sales offering "X% off" all orders and all products. Defendant states that these discounts will end on a certain date.[3]

4.    These purported sales are always advertised on Defendant's publicly available website.



*Figure 1. Defendant's "20% Off All Orders" sale advertisement.*
*Plaintiffs' Third Amended Complaint, Page 3.*

5.    "These purported discounts are also advertised on the price quotes that consumers receive from Defendant, regardless of how that quote was requested (online, in-

---

[2] Plaintiffs' Third Amended Class Action Complaint, Filed 12/06/2024, ¶7.
[3] *Id.,* ¶8.

person, over the phone, or after consulting with one of Defendant's 'Expert Design Consultants'), and before consumers place their orders. These quotes include supposed regular prices in strikethrough font; the supposed discount price that the consumers are receiving as a result of the supposed time-limited promotion; and a representation that the Product is being sold at a certain percentage off for a limited time. For example…"[4]



*Figure 2. Example Defendant Price Quote, Plaintiffs' Third Amended Complaint, Page 4.*

6.    As illustrated below in Figure 3, "purported discounts off regular prices are also included on each product page on Defendant's website."[5]



*Figure 3. Purported discounts off regular prices included product pages on Defendant's website, Plaintiffs' Third Amended Complaint, Page 5.*

---

[4] *Id.*, ¶10.
[5] *Id.*, ¶11.

7.     Plaintiffs assert, "Far from being time-limited however, Defendant's discounts are always available (and are always at least 15% off the purported list prices). As a result, everything about Defendant's price and purported discount advertising is false. The list prices Defendant advertises are actually not Defendant's regular prices (the price it usually charges) because Defendant's Products are always available for at least 15% less than that. The purported discounts Defendant advertises are not the true discount the customer is receiving, and are often not a discount at all, because customers can always buy Defendant's Products at the discount price. Nor are the purported discounts 'LIMITED TIME' or 'end[ing]' on the listed date – quite the opposite, they are always available."[6]

8.     Detailed descriptions and examples of Defendant's allegedly deceptive marketing practices are included in paragraphs 27-40 of Plaintiffs' Third Amended Complaint. These paragraphs include samples of Defendant's allegedly false advertisements and price quotes, which include purported "X% Off" discounts.

9.     I understand Plaintiffs seek to certify a nationwide class, a California class, and a Washington class that includes customers who purchased one or more products from The Shade Store that were advertised at a discount.[7]

10.    I have been asked to,

(a)     Discuss how advertisements that represent a sale is ongoing (including advertisements that state items are "on sale" using "price-off" statements/promises such as "X% Off" or "strikethrough" prices) influence customer purchasing behaviors;

---

[6] *Id.,* ¶12.

[7] *Id.*, ¶83; *Fitzgerald et al. v. The Shade Store, LLC* Plaintiffs' Second Amended Complaint, ¶70.

(b) Discuss how the inclusion of "end dates" (or "valid through" dates or other time limitation statements) in promotional messaging representing that a sale is ongoing influence consumer purchasing behaviors;

(c) Opine as to whether Defendant's advertising of time-limited or limited-availability sales or discounts, as described in Plaintiffs' Third Amended Complaint, would be important to a reasonable consumer deciding whether to purchase Defendant's products;

(d) Opine as to whether Defendant's advertisements promoting time-limited, "X% Off" discounts would likely mislead a significant portion of Defendant's general consuming public, acting reasonably in the circumstances.

(e) Opine as to whether Defendant's allegedly deceptive pricing practices influence sales in each of its sales channels, i.e., Direct to Consumers via its website, Direct to Consumers via its Design Consultants (whether that be through a showroom, online chat, telephony, or other medium) as well as to sales to customers who received Defendant's "trade discount" such as interior designers.[8]

11. My opinions in this action are based on my 50+ years of professional experience in the advertising industry as set forth in further detail below, as well as my review of the pleadings, deposition transcripts, and other documents listed in Exhibit "A," which is hereto attached, samples of the accused ads, and various internet-sourced articles, which are specifically cited throughout the report.

12. My compensation for expert witness services in this matter is $650 per hour for meetings, telephone conferences, document review, research and report preparation. My fee for appearances at depositions, arbitrations or trial is $6,500 per day. Additionally,

---

[8] Deposition of Suzanne Dominick (Corporate Representative), 12/4/2024, 13:2-9.

I am to be compensated for the travel and preparation expenses associated with my work on this case. My compensation is in no way contingent on the opinions I reach or the outcome of the case.

## II. QUALIFICATIONS

13.     I am the owner and manager of Silverman Consulting LLC, an advertising and branding firm I founded in 2005 to provide advice and counsel to companies both in the U.S. and abroad engaged in marketing consumer goods and services. In addition, I have worked with law firms both as a consultant and as an expert witness on cases involving false and deceptive advertising, trademark infringement, branding, media, publicity rights and advertising industry custom and practice. I have testified as an expert in federal courts in Arizona, California, Delaware, Florida, Illinois and Oregon, in state courts in California and Missouri, at arbitrations, and before the Copyright Royalty Judges of the Library of Congress.

14.     Attached as Exhibit "B" is a copy of my *curriculum vitae.* Also attached is Exhibit "C," a list of cases in which I have given sworn expert witness testimony during the past four years.

15.     My opinions are reflective of the accumulated knowledge and insights I have gained over the course of a 50+ year career working at the highest levels in the "real world" of marketing and advertising.

16.     After graduating with a Bachelor of Arts degree from Adelphi University (Garden City, New York) in 1966 and attending Albany (New York) Law School for one year, I began my advertising career at the Ogilvy & Mather agency ("O&M") in New York in mid-1967. During my more than 13 years at O&M I worked in the agency's offices in

New York (twice), London, Houston and Los Angeles. During much of that period, I was able to work side-by-side with advertising legend David Ogilvy, the agency's founder and one of the three most important advertising figures of the 20th century.[9] Under Mr. Ogilvy's tutelage I became a copywriter, later a copy supervisor, eventually a creative director and finally, a member of the agency's Council of Directors and Senior Vice President/Executive Creative Director at the firm's flagship New York office. Executive Creative Director, or Chief Creative Officer as it is sometimes called, is the highest-ranking position in the creative department of an advertising agency.

17. At that time, O&M was the fifth-largest advertising agency in the world, serving such clients as American Express, Avon, British Travel Association, Campbell Soup Company (Pepperidge Farm bakery products, Swanson frozen dinners, et al.), Cessna, General Foods (Maxwell House, Post Cereals, Country Time Lemonade, et al.), Hershey's, IBM, Lever Brothers (Dove soap, Imperial margarine, et al.), Mattel, Mercedes-Benz, Merrill Lynch, Nabisco (Chips Ahoy, Premium Saltine crackers, Oreo Double Stuf cookies, et al.), Panasonic, Shell, TWA and the United States Travel Service.

18. I later held C-level positions (Chief Creative Officer/Chief Operating Officer) at two other global agencies, Bozell & Jacobs Southwest (1981-1983), whose clients included American Airlines, Armour Foods, Avis, Greyhound, Mary Kay cosmetics, Pace Foods, Quaker Oats, Southwestern Bell and Zale Corporation, and

---

[9] David Mackenzie Ogilvy CBE (23 June 1911-21 July 1999) was the founder of the global advertising firm Ogilvy & Mather. Mr. Ogilvy was made a Commander of the Order of the British Empire in 1967, elected to the U.S. Advertising Hall of Fame in 1977, and appointed to France's Order of Arts and Letters in 1990. He was the author of two of the most successful business books ever published, *Confessions of an Advertising Man* and *Ogilvy on Advertising*.

BBDO/West (1984-1986), whose clients included Apple, Coldwell Banker, Dodge, Pepsi, Sizzler and the Union Bank of California. My responsibilities at those agencies included oversight of *all* client-service functions, including the account management and media departments, as well as the creative teams.

19.     I was co-owner, President and Chief Creative Officer of the Asher/Gould agency in Los Angeles from 1986 to 1997. The agency grew from $10 million to $160 million in annual billings during my tenure there, thus becoming one of the largest privately-owned advertising agencies in the country. Our clients included Avery Dennison (office products), Baskin-Robbins, the California Department of Health Services, HBO, MGM Grand Resorts, the Pabst Brewing Company, Pizza Hut, Sanyo (electronics), Sheraton hotels, Sun America (financial services) and Suzuki USA (cars and trucks).

20.     Although I started out on the creative side of the agency business, my long-term ambition was to run an agency, i.e., to become a CEO. To achieve that goal I needed to know as much about media as I did about the creative process. Media purchases generally account for 80-85 percent of most advertising budgets.

21.     That is why I made it my business to learn how media strategies are developed, how tactics are planned, and how television and radio time, magazine and newspaper space, on-line, digital and social media and out-of-home ads (billboards, transit ads, bus shelter ads, etc.), are negotiated, purchased and stewarded.

22.     In 1997 I was appointed President/CEO of the principal U.S. unit of Western International Media (later known as Initiative Media), then the largest ($22 billion

in annual billings) advertising media planning and buying agency in the world.[10] During the five-year period I led the U.S. agency (1997-2002) we served more than 500 clients, including American Honda's Acura division, Albertson's, American Airlines, Bell South, Carl's Jr/Hardee's, Chevrolet, The Walt Disney Company, The Home Depot, Johnson & Johnson, Kroger's Ralphs and Fry's divisions, the Las Vegas Convention & Visitor's Authority, Safeway, Sav-On and Osco drug stores, Six Flags, Taco Bell, the United States Navy Recruiting Command and Unilever.

23.    In 2003, longing to return to an entrepreneurial business environment, I joined Wong Doody, a top 100, privately-owned, full-service agency with offices in Seattle and Los Angeles, as a partner and President. The agency's clients included Alaska Airlines, Alpine Electronics, Autodesk (architectural and engineering software), Clif Bar, Inc., the Los Angeles Dodgers, MGM Home Entertainment, Sony Pictures, T-Mobile and the UCLA/Anderson School of Management.

24.    As previously noted, I founded Silverman Consulting LLC in 2005. In addition to its consulting services, it has provided both creative and media services typically offered by advertising and media planning/buying agencies to a significant number of domestic and international clients, including two of the largest healthcare systems in America, a major university, multi-state retail chains, professional service providers, real estate developers and independent motion picture producers.

25.    A list of clients I served during and after my advertising agency career is included in my CV (Exhibit "B").

---

[10] Initiative is a wholly-owned subsidiary of the Interpublic Group of Companies (NYSE:IPG).

26. Hundreds of advertisements I created have been published in consumer and business magazines, newspapers, billboards, and on websites. I have also written and produced more than a thousand national, regional, and local television and radio commercials, many of which have been referenced in popular books about advertising or advertising textbooks written by leading academics.

27. Advertising practitioners are most typically recognized within the industry for the campaigns they helped create. I coined the tagline "Don't Leave Home Without It" for American Express, which it employed as its global slogan for nearly 20 years. (A variant of "Don't Leave Home…" was revived in 2021.) I helped American consumers rethink their opinion of Mercedes-Benz automobiles by advertising them as "Engineered Like No Other Car in the World." (At that time, advertising for American luxury cars such as Cadillac, Chrysler Imperial and Lincoln Continental focused almost entirely on styling; the bigger the tailfins the better!) My "Bullish on America" campaign helped transform Merrill Lynch's reputation from that of a big retail wire house into an innovative provider of a broad range of financial services and inspired its famous logo. My global "Shell Answer Man" campaign de-commoditized Shell gasoline, helping propel the company to market leadership in the United States for more than a decade. I also created the advertising campaign that ridiculed a salsa made in "Nooo Yawk Ciddy," which resulted in Pace Picante Sauce, then marketed by a tiny company in San Antonio, becoming one of America's best-selling condiments. I am particularly proud of the role I played in the strategic development and implementation of the State of California's ground-breaking tobacco-use prevention marketing campaign. It is credited with saving hundreds of

thousands of lives and more than a half-trillion dollars in healthcare costs.[11] It became the prototype for the many state-sponsored tobacco-use prevention campaigns that were implemented throughout the country in the 1990's.

28. In addition to creating and producing ads, as a creative director I was also responsible for guiding and approving the work of the many hundreds of copywriters, art directors and producers who, over the years, reported to me. There was only one way for me to be effective in that role: I had to become <u>a true student of advertising</u>. Tens and sometimes hundreds of millions of dollars were at stake each time I approved an ad. Media time and space is always costly, sometimes extraordinarily so, e.g., the network price for a single thirty-second commercial in the 2024 Super Bowl game was about $7 million, plus whatever it cost the advertiser to produce the spot. And from a practical standpoint, if a costly campaign fails to generate the revenue it was projected to deliver, odds are the agency will be fired. Advertising is a "what have you done for us lately" business.

29. In my experience most successful consumer advertising practitioners know a lot about how to create ads that *engage* consumers. But engaging is not *selling*. In my experience, that requires a deep understanding of <u>consumer purchasing behavior</u>, beginning with how people learn about a product, what they come to understand and appreciate about its brand, and finally, what factors ultimately lead them to deciding to purchase it.

---

[11] James Lightwood, et al., *Health Care Cost Saving Attributable to the California Tobacco Control Program, 1989 to 2018 (Final Report)*, Department of Clinical Pharmacy, Sch. of Pharmacy, Univ. of Cal, San Francisco (Jul. 26, 2020), available at https://escholarship.org/uc/item/53b9b8fz, accessed 1/21/2025.

30. That is why in addition to deriving useful information from the thousands of proprietary quantitative marketing and advertising studies I reviewed over the years, I estimate that between 1970 and 2020 I personally interviewed more than 5,000 consumers about advertising and branding issues for products and services ranging from business jets to ice cream cones. I have observed at least 3,500 focus group sessions as well, including sessions devoted entirely to discussing with consumers what they knew and felt about price promotions. Every study I reviewed, every focus group I attended, every one-on-one interview I conducted, and of course, what I learned every day on the job as a working advertising and branding professional cumulatively informed my knowledge of how consumers interact with advertising, including messaging promoting limited-time price-off deals.

31. As listed in my CV (Exhibit "B" of this report), many of my former clients were retailers. These included supermarket and drug store chains, big box stores, women and men's fashion retailers, department stores, jewelry store chains and even mattress stores. Promotional messaging regarding sales and discounts was an essential part of the marketing communications mix for every one of these clients. I have also worked with some of the largest automotive dealer associations in America, all of which frequently promoted limited-time pricing for some or all of their models. Every grocery product marketer I ever worked with periodically promised consumers price-off deals via couponing and in-store messaging. Clients that advertised heavily on television nearly always made their discount or other promotional messaging a key component of their media buys. My quick-service restaurant clients (which most consumers refer to as "fast food" outlets) frequently offered consumers price-off deals, or two-for-one deals, or all-you-can-eat deals via television to spur visitation. My airline clients often advertised

13

limited-time deals, especially for their most highly competitive city pairs. My one and only major league baseball team client sometimes advertised BOGO ("Buy One/Get One" for free) deals for Dodger Dogs, though only when the upcoming series was with a cellar-dwelling (or close to the cellar) visiting team. (It is amazing how a free hot dog can sometimes rack up sales of thousands of tickets, even for pricey box seats!) Nearly all of my clients (since the early 2000's) advertise and often offer discount pricing for their products and services on the web as well.

32.     I have been the recipient of virtually every significant award for advertising effectiveness and creativity offered by the advertising industry, including twice winning a Gold Lion at the Cannes International Advertising Festival, the "Oscar" of the advertising business. I have also been the recipient of three American Marketing Association "Effie" awards, which recognizes campaigns that are most effective at driving sales. Initiative was twice named Media Planning and Buying Agency of the Year by the industry's leading trade publication, *Advertising Age*, during my tenure there.

33.     I served on the Board of Directors of the American Association of Advertising Agencies (the principal trade association of the advertising industry) and on the boards of the Los Angeles Advertising Agency Association, the Dallas Advertising Club and the Houston Advertising Federation. I was also a long-standing member of the commercials peer group of The Television Academy (the "Emmys" organization).

34.     I have taught advertising at Pepperdine University and the University of California, Los Angeles (UCLA) Extension, where I also served for five years as a member of the Dean's Board of Advisors. In addition, I have guest-lectured on advertising at many of America's top colleges and universities, including Arizona State, NYU, Rice, SMU, Stanford, the University of Arizona, the University of California (Berkeley), the University

of Houston, the UCLA Anderson School of Management, the UCLA Fielding School of Public Health, the University of Southern California, the University of Texas and the Thunderbird School of Management.

35. I have been interviewed by *The New York Times*, *The Chicago Tribune, The Los Angeles Times, The Washington Post, The Wall Street Journal*, *The New Yorker* and many other newspapers and magazines, as well as by on-air personalities at television and radio networks and stations, about issues involving advertising, branding and media.

36. My expert testimony and my process for evaluating advertising messages was accepted by both the Honorable Lucy H. Koh and the Honorable William H. Orrick as evidence of materiality in their decisions certifying classes in two cases involving advertising claims, *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1115 (N.D. Cal. 2018), and *Debbie Krommenhock, et al., v. Post Foods, LLC*, 34 F.R.D. 552, 565-66, 579-80, 587 (N.D. Cal. 2020), as well as by the Honorable Virginia M. Kendall in *Zarinebaf v. Champion Petfoods USA, Inc.*, No. 18 C 6951, 2022 U.S. Dist. LEXIS 56603, at *17-23 (N.D. Ill. Mar. 29, 2022). In addition, my opinions have been held as relevant in deciding class certification and summary judgment. Judge Orrick noted that my advertising opinions were "relevant and helpful" for claims in a case concerning marketing of a premium-priced dog food that did not disclose the risk of heavy metals. *Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 683 (N.D. Cal. 2021). Judge David O. Carter found my expert knowledge in the field of advertising to be helpful for the trier of fact to understand the impact a label claim would have on consumers. *Mier v. CVS Pharmacy, Inc., et al.,* No. 20-cv-01979, 2022 U.S. Dist. LEXIS 96082, at *14 (C.D. Cal. May 9, 2022), *rev'd on other grounds sub nom.*, *Mier v. CVS Health*, No. 22-55665, 2023 WL 4837851 (9th Cir. July 28, 2023). And the United States Court of Appeals for the 9th Circuit affirmed the district court's grant of class

certification in *Lytle v. Nutramax Laboratories, Inc.* 99 F.4th 557 (9th Cir. April 22, 2024), noting that plaintiff relied upon my expert report to establish that a reasonable consumer would have found the marketing messaging on the Nutramax product label misleading.

### III. SUMMARY OF OPINIONS

37.    Representations that items are on sale or that discounts are available play an important role in the customer purchase decision process for virtually all products and services sold online as well as at brick-and-mortar retail outlets.

38.    The perception that sales and discounts are limited in time and availability also plays an important role in consumer purchase decisions, as explained in detail below.

39.    In my opinion, Defendant's advertising of sales, discounts and strikethrough prices, as described in Plaintiffs' Third Amended Complaint and as demonstrated in documents I have reviewed like Defendant's price quotes, would be important to a reasonable consumer in deciding whether to purchase one or more of Defendant's products. This advertising would be important to reasonable consumers regardless of sales channel (i.e., regardless of whether the consumer made their purchase online or through a Design Consultant).

40.    In my opinion, Defendant's advertising of strikethrough prices and percent-off discounts, as described in Plaintiffs' Third Amended Complaint and as demonstrated in documents I have reviewed like Defendant's price quotes, would also be important to customers who made a purchase using Defendant's "trade discount" (e.g., interior designers, et al.)

16

41. Based on the evidence I have reviewed concerning Defendant's sales practices, it is my opinion that a significant portion of Defendant's general consuming public and trade customers, acting reasonably in the circumstances, would be misled.

42. In particular, in my opinion a reasonable consumer receiving a purported discount would understand that the promotional messaging on Defendant's website and in Defendant's price quotes conveys that Defendant's products usually retail for the strikethrough prices featured on Defendant's website and price quote and sale confirmation documents, and that those strikethrough prices are the prices that consumers usually and typically pay to buy Defendant's products. Further, reasonable consumers would understand Defendant's promotional messaging to mean that they could receive a discount off of those usual and typical prices and therefore pay prices lower than the usual and typical prices (i.e., discounted prices) by purchasing subject to a sale or discount offered to them. However, as the testimony and evidence discussed in greater detail below shows, discounts of at least 15-20% were always available to all of Defendant's customers during the relevant timeframe, and the overwhelming majority of customers who purchased during the relevant timeframe paid prices at least 15-20% below the advertised "list" prices for Defendant's product. In other words, reasonable consumers would believe, based on Defendant's advertisements and price quotes, that they are getting a real discount, when they are not; they are just paying the typical price for Defendant's products.

43. Defendant's advertising and promotional messaging conveys similar messages to reasonable "regular" consumers and reasonable "trade" customers alike. (As explained below, Defendant offers special "trade" discounts to qualifying customers such as interior designers). Like regular consumers receiving regular purported discounts, "trade" customers receiving the trade discount would understand Defendant's messaging

to convey that Defendant's products usually retail for the strikethrough prices featured on Defendant's website and price quote and sale confirmation documents, and that those strikethrough list prices are the prices that trade customers would have had to pay to buy Defendant's products absent the trade discount. In other words, reasonable trade customers would believe, based on Defendant's advertisements and price quotes, that they are getting a real discount of an amount and percentage equal to that represented on the advertisements and price quotes, when in fact, they are not.

44. In my opinion, a reasonable consumer would rely on the veracity of Defendant's messaging, i.e., that Defendant's "discount" prices for the products are truly less than the regular and typical prices of the products that the strikethrough price is truly the regular price which consumers typically have to pay and typically do pay for the products, and that they are receiving the advertised discount from the regular prices when purchasing products at the discounted prices during the promotional period.

45. Reasonable customers would rely on the veracity of Defendant's price messaging, including its strikethrough "regular" price messaging, regardless of whether those customers were receiving the limited-time discount, a discount through a promotional code, or Defendant's "trade discount."

46. My rationales for these opinions follow.

## IV. ADVERTISEMENTS FEATURING PRICE-OFF MESSAGES PLAY AN IMPORTANT ROLE IN THE CUSTOMER PURCHASE DECISION PROCESS

47. There are myriad reasons companies and other entities invest their hard-won dollars in advertising. Some companies use advertising to help define their brand or to increase brand awareness. Political candidates often use advertising to promote their

18

candidacy or to attack a candidate from the opposing party. Social marketers, which often include government entities and not-for-profit organizations, sometimes use advertising to discourage the use of tobacco or illegal drugs or other anti-social behavior. But by far, most consumer marketers rely on advertising to help promote their products or the services they offer. Simply put, it is to *sell*.

48. But there is a big difference between <u>brand advertising</u>, which is the method marketers use to distinguish and add value to their products, and <u>promotional advertising</u>, which offers consumers a discount (e.g., a "Sale" price) or some other type of limited-time or limited-availability incentive. Both are valid ways to market products if used appropriately.

49. I spent many years in the advertising agency business helping promote products sold at supermarkets such as breakfast cereal, coffee, frozen dinners, dog food, soda, beer, salsa, cookies, hot dogs, snacks, candy, energy bars, and soap. Nearly every campaign I worked on for those clients relied on television to help define the brand, while retailer print ads and fliers, online messaging, and point-of-sale ads that offered a limited-time discounted price for a product were used to generate short-term sales increases.

50. For example, my "Not Made in Noo Yawk Ciddy" television campaign for Pace Picante Sauce was strategically focused on a core brand value of *authenticity*. Almost every Pace commercial included a variant of this line: "Pace is made with real herbs and spices in San Antonio by people who know what



***Figure 4. Screenshot from 1981 Pace Picante commercial***

19

Picante sauce is supposed to taste like." "Authenticity" differentiated Pace from other salsa brands in the minds of consumers, an attribute they saw as beneficial.

51.     We probably considered more than a dozen different ways to engage the attention of television viewers for our Pace Picante campaign before settling on a creative strategy that parodied the "slice of life" format that had been a staple of packaged goods for decades. But instead of a harried mom serving dinner in the family's dining room, we replaced dad and the kids with a bunch of cowboys taking their dinner break near a chuckwagon somewhere out on the prairie. Instead of "mom" taking the family's barbs for serving a less than wonderful meatloaf, we featured "Cookie," a grizzled veteran of the plains, who tried to get away with serving the boys "Brand X" salsa (made in "Noo Yawk Ciddy," no less) instead of Pace, the salsa "…made in San Antonio…"

52.     Consumers responded very well to our brand commercials, and Pace quickly became America's bestselling salsa. But nearly every retail chain that carried Pace put it on sale from time to time to create a favorable price disparity with other salsa brands, which gave consumers an immediate incentive to put a jar in their shopping carts.



*Figure 5. Pace Picante on sale at a Kroger store.*

53.     One of the things I learned early on in my career is that successful marketing campaigns are rarely those that merely find a clever way to say what the advertiser wants to say. Rather, the most effective ads are those that are predicated on responding to <u>what consumers want to hear</u>. And consumers want to hear about discount pricing; they want to get "a deal." In other words, they want to pay less

for products than the typical price that consumers have to pay for that same product. I have yet to encounter a consumer for whom price is no object. It is always an important factor in the purchase decision process. The same goes for sophisticated customers such as interior designers. In my experience, such trade customers are just as interested in getting a "deal" – through a trade discount or otherwise – as regular consumers.

54. In fact, a 2021 Publicis Sapient survey of 1,000 respondents from the United States, the U.K., France and Sweden demonstrates that getting a price discount (versus offers promising Free Shipping, or a Free Gift With Purchase) is the overwhelming "favorite" promotion among consumers, pretty much throughout the western world.[12]

55. A 2018 survey conducted by RetailMeNot "…found that nearly three-fourths (74 percent) of Americans say offers are a top factor when deciding where and what to buy online. And four out of five (81 percent) of Americans say finding a great offer or discount is on their mind throughout the entire purchase journey. The survey found that two-thirds of consumers have "made a purchase they weren't originally planning to make solely based on finding a coupon or discount." Similarly, four out of five (80 percent) said they feel encouraged to make a first-time purchase with a brand that is new to them if they found an offer or discount."[13] And a recent Invesp infographic reported on "How Discounts Affect Online Consumer Buying Behavior," stated that "Nearly two-thirds of consumers surveyed admitted that a promotion or a coupon often closes the deal, if they are wavering

---

[12] https://www.statista.com/statistics/1270573/best-discounts-according-to-shoppers, accessed 1/21/2025.

[13] Peter Roesler, *New Study Shows Deals and Promotions Affect Every Part of Shopping Experience*, Inc, (April 30, 2018), https://www.inc.com/peter-roesler/new-study-shows-deals-promotions-affect-every-part-of-shopping-experience.html#:~:text=A%20new%20survey%20from%20RetailMeNot,a%20business%20can%20be%20underestimated, accessed 1/20/2025.

or are undecided on making a purchase," and that "83% of respondents said they were "somewhat likely" or "very likely" to click an ad offering a discount or promotion.[14] An important reason for this is that the perceived value of an item influences consumer's willingness to purchase the item. So, for example, a consumer who was only planning to spend $100 on a new armchair might be willing to spend more – say, $150.00 – if they find a 50% off deal on a more expensive armchair that usually retails for $300. This works especially well in markets where consumers are unaware of the true value of the product they are purchasing and so rely on the "regular" prices (or "list" prices or, as here, represented by strikethrough prices) featured in an ad as indicators of true "value."

56.     In my experience, the desire by consumers for price-off (sale) pricing extends to nearly every product and service category. During the years I helped George Zimmer promise "I Guarantee it" in his many Men's Wearhouse television commercials, the chain conducted only one sale event a year, and it lasted for only one week each January. Amazingly, that one-week sale event generated more revenue each year for the chain than any full month. My Chevrolet dealer association clients typically offered discount pricing each summer to clear out inventory before new models hit the showrooms in the Fall. Consumers looking for "a deal" flocked to the event. Another former client, the Center Theatre Group, the preeminent theatrical presenter in the Los Angeles area, provides hundreds of reduced rate tickets for most of the big Broadway shows that play the Ahmanson Theatre to TodayTix, which in turn resells them at a substantial discount. Price conscious theater-goers snap them up.

---

[14] Khalid Saleh, *How Discounts Affect Online Consumer Buying Behavior*, Invesp, https://www.invespcro.com/blog/how-discounts-affect-online-consumer-buying-behavior/#:~:text=More%20than%2070%25%20of%20US,offering%20a%20discount%20or%20promotion, accessed 1/21/2025.

57. At any given time Disneyland (another former client) periodically offers multiple discounts to California residents, ranging from sale-priced admission tickets to 20-percent off stays at the resort's hotels. Smart consumers check the Disneyland website



*Figure 6.*
*https://disneyland.disney.go.com/offers-discounts/*

regularly to get the best deal on visits to the "Happiest Place on Earth." Nearly every airline, including my former clients American and Alaska, sometimes get involved in price wars with other carriers for certain city pairs. Sale pricing applies. Alaska, which started flying to Hawaii from San Francisco a few years ago, offered a limited number of seats for the first two weeks it flew the route at $39 each way to create marketplace buzz, and got it.

58. Consumers appreciate limited-time or limited availability price-off deals so much that there have been instances where they "punish" marketers that do away with them. An article by Panos Mourdoukoutas in the February 24, 2017 issue of *Forbes* related how JC Penney lost its way after revamping its stores and replacing price-off store coupon sales with an "everyday low price" strategy. "But that strategy didn't work, as evidenced by the company's string of disappointing sales and earnings reports…"[15] Another article, published by *CNN Business*, described Penney's move away from price-off coupon sales as a "disaster" and reported that Penney's "[s]ales tanked nearly 25% in a year and the

---

[15] Panos Mourdoukoutas, *A Strategic Mistake That Still Haunts JC Penney*, Forbes (Feb. 24, 2017), https://www.forbes.com/sites/panosmourdoukoutas/2017/02/24/a-strategic-mistake-that-still-haunts-jc-penney/?sh=630323941bcf, accessed 1/21/2025.

company's stock plunged" after the change to its promotional pricing strategy.[16] Penney eventually returned to its former strategy of offering consumers price-off deals, but it appears that was a too little, too late move.[17]

## V. CONSUMERS VIEW SALES AS TIME-LIMITED OR AVAIALBILITY-LIMITED AND THIS PLAYS AN IMPORTANT ROLE IN CONSUMER PURCHASING DECISIONS

59.     Consumers do not need a dictionary to understand that a sale is "a period during which a retailer sells goods at reduced prices."[18] In fact, in my experience the word "Sale" is understood by most consumers, regardless of the language they speak. And words and phrases like "discount," and/or phrases such as "promotional price" entice shoppers to purchase sooner. "This can be attributed in part to the idea of scarcity, wherein consumers understand that there aren't always discounts available to help them save money. Additionally, *Psychology Today* points out that 'anticipatory regret' (regret from missing out on the deal) is also a huge urgency driver when it comes to promotions."[19]

60.     Limited-time sale events are no mystery to consumers. Most of us grew up with parents and maybe even grandparents who were smart enough to take advantage of price-off deals, recognizing that sale pricing is a use it or lose it proposition. I have rarely seen a sale event fail for want of customers. That includes limited-time sales events for

---

[16] Nathaniel Meyersohn, *JCPenney and Tied tried to get rid of coupons. It was a disaster*, CNN Business (Mar. 5, 2022), https://www.cnn.com/2022/03/05/business/coupons-history-jcpenney-macys-procter-and-gamble/index.html, accessed 1/21/2025.

[17] Panos Mourdoukoutas, *A Strategic Mistake That Still Haunts JC Penney*, Forbes (Feb. 24, 2017), https://www.forbes.com/sites/panosmourdoukoutas/2017/02/24/a-strategic-mistake-that-still-haunts-jc-penney/?sh=630323941bcf, accessed 1/21/2025.

[18] Oxford Languages' definition of "sale," as reported by Google search.

[19] *Leveraging the Psychology of Discounts to Make More Money*, Volusion (April 9, 2024), https://www.volusion.com/blog/using-the-psychology-of-discounts-to-make-more-money, accessed 1/21/2025.

expensive products such as cars, ocean cruises and diamond jewelry, as well as for moderately or low-priced products like jeans, candy bars, hobby items, ice cream cones and soda. Most Americans try to take advantage of sales – and are often very excited to do so – all year long. That is why "Black Friday" and "Cyber Monday" sales have become so successful and anticipated by consumers. As discussed above, consumers really respond well to advertised sales, be they price-off's, BOGO's, free with purchase offers or other promotional deals that appear beneficial.

61. In my experience, consumers understand "Sale," "% Off," and similar promotional statements to mean that a product that is usually sold at a "list" or "regular price" is now (or soon will be, when the sale takes effect) available at a lower price. This belief is reinforced when the "Sale," "% Off," or similar promotional statements include a strikethrough list price. Consumers understand a strikethrough list price to be the price that the item is typically sold at most of the time to most consumers, and that it represents the true "value" of the product in question. Consumers understand that by taking advantage of the sale or discount they will benefit by being able to purchase the product at a discount for less than it typically and usually sells for most of the time. It is that simple. This is how true limited-time (or limited-availability) sales are typically advertised, and consumers are familiar with how these sales work and what the promotional messaging means.

62. While consumers naturally understand that sales are time-limited (or limited in their availability), retailers often emphasize this explicitly by stating the sale is "Limited Time!" and other ways by including a termination or "valid through" date in their ads. Consumers see the termination date as a warning: Act now or miss out on the deal. That creates urgency. This, in turn, drives sales. Consumers who may have waited to make a purchase until a later time accelerate their purchase decision to take advantage of the

promotion. And consumers who otherwise might comparison shop and ultimately buy elsewhere might decide to buy now, from the company marketing the sale, to take advantage of the time-limited discount. This is especially true if they are already reasonably confident that they are getting a good deal, considering that they are getting a discount.

63. There is nothing wrong with the inclusion of an honest "valid through" or termination date (a date when the sale actually ends) in an ad or coupon. But if the sale just pops up again immediately, with a new "valid through" date, and that pattern continues, that misleads ordinary, reasonable consumers. In short, a sale without an honest end date is actually not a sale, and a discount price without an honest end date is just a regular price. Saying otherwise is nothing more than an attempt to make a product's everyday price sound better than it really is.

64. I reviewed a copy of Defendant's Promotional Calendar that was provided to Plaintiffs through the discovery process. It was quite obvious to me that Defendant's "Storewide Sales" events were not time-limited, but were, as a practical matter, reoccurring events. For example, its "20% Off Sitewide Sale," which began on 10/1/2020, was scheduled to end 10/28/2020. But yet another "20% Off Sitewide Sale" began on 10/29/2020 and ran until 11/11/2020, which was immediately followed with another "20% Off Sitewide Sale" starting 11/12/2020 that ran until 11/25/2020, which was followed with another "20% Off Sitewide Sale" that began 11/26/2020 and was scheduled to end on 12/9/2020. But that is not when it really ended. In fact, the "20% Sitewide Sale" that began on October 1, 2020 ran <u>continuously until July 6, 2022</u>. That promotional event was immediately followed by a "15% Off Sitewide Sale" that began July 7, 2022. The Promotional Calendar shows that Defendant offered continuous "15% Off Sitewide Sales" or a combination of 20% off certain product categories and 15% off all other products from

July 7, 2022 until at least August 23, 2023 – over a year later. In fact, from at least February 21, 2020 to November 29, 2023, The Shade Store was pretty much always promoting storewide sales events promising a 15% or 20% discount. Sale pricing for certain product categories ran before and after these dates.[20]

65. My analysis of Defendant's nonstop sales period, i.e. February 21, 2020 to November 29, 2023, was confirmed at her deposition by Defendant's Chief Revenue Officer, Suzanne Dominick.[21] When asked whether Defendant "consistently offer[ed] a site wide discount of at least 15 to 20 percent on all of its products" from "February of 2020 to November of 2023," she responded that "There was a discount on the TSS website of between 15 to 20 percent off during that time period with different promotional activations around it."[22] And when asked if "everyone who bought during that time frame was eligible for at least the discount offered on the website," Ms. Dominick's response (after explaining that some customers might be eligible for a greater discount under certain circumstances) to that question was, "They would be eligible."[23] Ms. Dominick also confirmed that, even after that period, through the date of her deposition, Design Consultants had the ability to offer a discount of at least 15% to all consumers who purchased through a Design Consultant, which I understand to be the vast majority of consumers.[24]

---

[20] TSS0008879.

[21] Dominick, 97:13-21.

[22] *Id.*

[23] *Id.,* 97-22-98:9; *see id.* 155:14-157:3 (trade discount of at least 20% always available to trade partners).

[24] *Id.,* 101:1-103:9.

66.     I observed a few small gaps in the promotional calendar but have since learned that those gaps were not gaps at all, but rather, omissions on the calendar. For example, the calendar shows that there were no discount events from November 9, 2022, to January 4, 2023. But as Defendant's email advertisements that were sent during that period demonstrate, and Ms. Dominick confirmed at her deposition, discount events offering discounts of at least 15%-20% did run throughout that period.[25]

67.     I understand Defendant has produced its sales data in the form of line-item reports which set forth the details of each of the sale transactions Defendant made to consumers during the relevant timeframe. ██████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

68.     For the record, certain discounts that I have observed in examples of Defendant's website and price quotes that I have reviewed do not include specific termination dates. Some, such as the "15% Off" ads illustrated on pages 9 and 10 of Plaintiff's Third Amended Complaint, reference the names of a promotion, i.e., Defendant's "Summer Sale" and its "Autumn Sale." Other simply state the name of a promo code, for example "PROMO CODE 20%".[26] In my experience, regardless of whether an end date is included in a promotion, reasonable consumers would understand a "Summer Sale" to be an event that would commence sometime in June and terminate at the end of August and an "Autumn Sale" to be an event that would commence in September

---

[25] *Id.,* 116:17-119:15; 120:15 - 121:15; TSS0006135; TSS0006170; TSS0006195; TSS0006216.
[26] TSS0011882.

and terminate at the end of November.[27] The names of those events would, in my opinion, influence consumers much the same as would a specific termination date, i.e., it would create urgency. Even in the absence of a name suggesting a specific termination date, reasonable consumers understand that by their very nature promotional sales and discounts are limited in time or availability (otherwise they would not be promotions or sales at all, they would just be regular prices). So, it is my opinion that, regardless of whether a specific termination date is included, reasonable consumers who were offered a promotional discount would understand that the discount they were receiving was special and limited, something that consumers typically don't get.

## VI. CUSTOMERS ARE MORE LIKELY TO PURCHASE AN ITEM IF THEY THINK THEY ARE GETTING A GOOD PERCENTAGE OFF THE REGULAR PRICE

69.     As previously discussed, many of my former clients are mass merchandisers, i.e., supermarkets and drug stores. Others fell into the big box category. I regularly made (and continue to make) it a practice to interview consumers on a one-on-one basis in the aisles of these retailers about their shopping habits. I call this practice "Marketplace Sleuthing."

70.     As much as I believe in quantitative marketing studies, nothing beats one-on-one conversations with consumers who are actually involved in deciding what to put in

---

[27] Climatologists usually use full months to represent the seasons. Winter is considered December, January and February; spring is March through May; summer is June through August; and fall or autumn is September through November. https://climate.ncsu.edu/learn/seasons/#:~:text=Climatologists%20usually%20use%20full%20months,autumn%20is%20September%20through%20November, accessed 1/21/2025.

their shopping cart or not. The consumers I interviewed were hardly ever shy at pointing out the importance of price to them. But emotional benefits also mattered a lot. Shoppers told me that purchasing a discounted product made them feel more confident that they were making a smart decision. They most certainly weren't ashamed to say, "Hey, look how much I saved," or "It was a great deal."

71.     In my experience consumers assume that a sale price is a discount off a product's regular (full) price. I observed many focus group sessions for retail clients such as Aaron Brothers Art Marts, Baskin-Robbins, C&R Clothiers, Carl's Jr., The Men's Wearhouse, Pioneer Chicken, Pizza Hut, Sears and Zales, as well as the Disneyland and Walt Disney World and Universal Studios Hollywood and Universal Orland attractions at which the subject of discount pricing was at issue. Our clients wanted to hear from customers and prospects about how frequently they thought sales should be held, how long a sale should run, to what degree prices should be cut, whether they should consider switching to a "low prices all the time" strategy, etc. Not surprisingly, nearly all the participants at these sessions understood that they would have paid more if they had made a purchase before a sale began, and nearly all assumed they would have had to pay more – i.e., the full price – if they waited and missed the sale altogether. I never once heard consumers say that they assumed or believed that sale prices were fake, i.e., that they were nothing more than the regular price claiming to be a sale price.

72.     In my experience, customers who receive trade discounts similarly care about getting a good deal and similarly believe that the sale price is a discount off a product's regular (full price). Many of my former clients (e.g., American Airlines, my QSR clients, financial services companies, et al.) relied on intermediaries (e.g., independent sales agents) to represent and sell their products to consumers. Given the important role

30

these intermediaries played in the sale process, my colleagues and I regularly made it a practice to interview them either on a one-on-one basis or observe them at focus group sessions. These interviews and focus group sessions revealed that, at the end of the day, sales agents – be they travel agents, beer distributors, insurance agents, gasoline jobbers or QSR franchise owner/operators – are subject to the same desires as most consumers; they want to get the best deal they can from the entity that gives them a trade discount.

73.     It has also been my experience that customers of all types greatly value being able to compare the regular price of a product to the "discounted price." In fact, according to an analysis published by the American Marketing Association's *Journal of Public Policy & Marketing,* "Comparative price advertising offers consumers a basis for comparing the relative value of the product offering by suggesting a monetary worth for the product and any potential savings. For example, the comparative price advertisement, 'regular price $10, on sale $7.99,' suggests a monetary worth of $10.00 and a savings of $2.01. To the extent that consumers do not have this information about potential savings, the comparative price advertisement is beneficial because more informed consumers are likely to make better purchase decisions."[28]

74.     Defendant employs comparative price messages in many of its ads, on various pages of its website, including its shopping cart page, in its price quotes, and in the order confirmations it provides to its customers. As illustrated in the Roller Shade ad that appears on the following page (Figure 7), the promotional message includes a percentage

---

[28] Dhruv Grewal and Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive? Journal of Public Policy & Marketing*, Spring, 1992, Vol. 11, No 1, pp. 52-62. Sourced from https://journals.sagepub.com/doi/10.1177/074391569201100106, accessed 1/21/2025.

off claim (i.e., 15%), the purported regular price, which is crossed out (~~$285~~), and the purported resultant sale price ($242).



*Figure 7. TSS0039637.*

75.     But in Defendant's ad, the strikethrough price represents a price that is not the regular price at all; rather, <u>it is a fictitious price</u>; a number that is the mathematical basis for the supposed discount price, which is the actual regular price. It is not the pre-sale price, because the product is always "on sale," nor is it a price that a consumer would have to pay after the sale ended, because the sale continued indefinitely.

76.     Similarly, the purported regular price of the product, which is represented by a strikethrough number followed by the purported discount price, appears on Defendant's Price Quotes and Order Confirmations, samples of which appear on the pages that follow.



*Figure 8. The Shade Store Price Quotes (with callouts added), TSS0039289.*



| | | |
|---|---|---|
| QUANTITY: | 1 | 15% SALE (ENDS 02/01/23) |
| PRODUCT: | Roller Shades | ~~$955.00~~ |
| MATERIAL: | Cora | **$811.75** |
| COLOR: | white | |
| MOUNT: | Outside | |
| WIDTH: | 50 7/8" | |
| LENGTH: | 90 3/8" | |
| CONTROL: | Continuous loop | |
| CONTROL POSITION: | Right | |
| BRACKET TYPE: | Round | |
| BRACKET COLOR: | gunmetal | |
| CHAIN COLOR: | gunmetal | |
| ROLL: | Regular | |
| BOTTOM BAR: | Sewn-in | |
| ESTIMATED SHIP DATE: | 02/06/2023 | |

*Figure 9. The Shade Store Order Confirmation, TSS0038338.*

77. As discussed in an article in the American Marketing Association's *Journal of Marketing*, "It is now well accepted that many consumers get extra utility, beyond that associated with consuming a product, from purchasing it on a deal and the magnitude of this utility is a function of the size of the deal. Firms have long known (or at least intuitively known) this; in response they often feature the selling price relative to a reference price – for example, a 'former' price – to increase demand beyond the level solely induced by a lower price. These two stylized facts have led some firms to artificially inflate reference or comparison prices in sale communications so as to increase consumers' perceived utility in its offerings, which in turn leads to greater demand and profits."[29]

---

[29] Richard Staelin (Professor of Marketing, Fuqua School of business, Duke University); Joel E Uerbany (Professor, Mendozza College of Business, University of Notre Dame); Donald Ngwe (Economist and Senior Principal Researcher, Microsoft, USA), *Competition and the Regulation of Fictious Pricing,* 87(6) American Marketing Association Journal of Marketing,826 (2023).

78. To summarize (and emphasize), the strikethrough price that appears in Defendant's website, online ads, price quotes, and in its order confirmations is <u>not</u> the product's regular price, but rather, <u>it is a totally fictious price</u> since the products are rarely if ever sold at those prices. <u>The regular price, the price at which the product is typically offered at and sold at, is instead 15-20% lower</u>, which belies the alleged discount. It is my opinion that this false price advertising makes it so that customers are more likely to purchase Defendant's products because of their desire to get a good deal.

## <u>VII. DEFENDANT'S "SALE" CLAIM WOULD BE IMPORTANT TO A REASONABLE CONSUMER IN DECIDING WHETHER TO PURCHASE ONE OR MORE OF DEFENDANT'S PRODUCTS</u>

79. It is important to recognize that the advertised items in this matter are, for most consumers, not frequently purchased products. They are not heads of lettuce or eggs that are purchased every week, or landscape products that are purchased as the seasons change, or up-sized clothing for growing kids. Rather, they are only purchased when they are specifically needed or wanted. Newly built homes and apartment units almost never come with window coverings such as blinds, shades or shutters; it is left to the buyer or renter to decide what type of window treatment they want. When people move into an older home or previously occupied apartment they may or may not need to make window covering changes. Even potential repeat customers, such as interior designers, are not constantly purchasing these items.

80. That is why the advertisements at issue in this matter would, in my opinion, be quite effective. Each advertisement promised big discounts; the storewide discounts were regularly described as 15 or 20% off, and sometimes even 25% off. And the trade discounts equaled or exceeded those levels. This conveys the idea that the value of the advertised products are much higher (at least 15-20% higher) than what customers would have to pay but for the promotion. And, because most customers are not used to purchasing window treatment products, and because window treatment products vary significantly in style, material and quality, they are not likely to know any better or be able to determine on their own whether the products are worth the strikethrough price Defendant is advertising.

81. I see no reason why trade customers exposed to Defendant's advertising would understand the promised savings differently than an average consumer would. The structure of Defendant's promotional pricing as featured in its advertising – the strikethrough price and the resulting supposed discounted price – is consistent with the way other companies advertise legitimate sales and discounts. That is why I believe that trade customers would, like the average consumer, believe that Defendant's strikethrough price is the regular price of the product, and would believe that they are getting a significant discount off of that regular price.

82. In addition, all ads included and/or featured messaging conveying that consumers would receive a percentage off discount or an amount off discount (such as a purported list price in a strikethrough font next to a lower, purported discount price) in a reasonably large font and mentioned the word "sale" or a marketing synonym, such as "event." All promised a deal. Customers love deals.

36

83. In my experience customers believe that a sale price promoted by a major retailer like The Shade Store is legitimate; i.e., it is a markdown from the established full price that the retailer normally charges and that most people have to pay for the same thing. During the focus group sessions I observed where sales pricing was discussed, most of the participants believed that at least half the retailer's regular customers lost out on getting a great deal because they missed the sale. They also admitted that sometimes they personally had (ruefully) missed out on a good deal by missing a promotional period.

84. In my experience, customers expect advertised regular prices to reflect relatively recent prices (and not old, stale prices). Customers generally expect a regular price to reflect what the item usually cost in the recent past. And this expectation would hold true both for customers who received the reoccurring sitewide discount or Design Consultant coupon discount, as well as customers who received Defendant's trade discount.

## VIII. IT IS PROBABLE THAT A SIGNIFICANT PORTION OF DEFENDANT'S GENERAL CONSUMING PUBLIC, ACTING REASONABLY IN THE CIRCUMSTANCES, WOULD BE MISLED BY ITS PROMOTIONAL MESSAGING

85. As previously discussed, consumers understand that promotional deals, i.e., discount or "sales" pricing, are operative for a limited time only, or are only available in special circumstances. In fact consumers are regularly exposed to price-off coupons in retail flyers that nearly always include an expiration date, price-off ads in online media that nearly always have an expiration date, and "On Sale" stickers attached to price tags on supermarket shelves that last only for a limited period (or only apply in certain circumstances, for example the discount discussed above that was only available for a

limited number of seats on an airplane). Commercials advertising promotional periods nearly always have – sometimes in the fine print near the bottom of the screen – expiration dates. It is common practice, and consumers are familiar with them and expect them. As discussed above, the valid-through date is intended to create urgency; consumers are much more likely to purchase the product being advertised sooner rather than later if they are aware that the sale price will not last forever.

86. But if, as Plaintiffs allege, the end date of Defendant's discount price promotions are meaningless, consumers would be misled as there would be no need for them to urgently take advantage of a fake "use it or lose it" time-limited promotion. They would also be misled by Defendant's representations regarding the strikethrough price representing the established typical price of the products that most people pay because a perpetual sale price is the true regular price.

87. My previous commentary regarding Defendant's Promotional Calendar, as well as Ms. Dominick's testimony regarding that subject, demonstrates that Defendant's promotional periods were anything but time-limited or availability limited. Therefore, I am of the opinion that Defendant's recurring, universally available, advertised sales would mislead reasonable consumers.

88. The discounted prices that appear in Defendant's sitewide percentage-off promotions, or in its product specific ads, are based on fictitious regular prices that are simply not regular prices. They are not the prices that consumers typically have to pay for the products. Nor are they the prices that most consumers actually do pay for the products. Ms. Dominick testified that every one of Defendant's customers from February 2020 to

November 2023 were eligible to receive at least 15% off.[30] Ms. Dominick also testified that even after November 2023, Design Consultants always had the ability to apply a discount of at least 15% to any order. And I understand this is borne out in Defendant's transactional data: from March 2020 to the present, ███████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████ As a result, the advertised strikethrough prices simply were not the prices at which the products were typically sold, or that most consumers paid. It appears their sole purpose is to provide the basis for the mathematical computation used to arrive at the percentage reduction price – the supposed discount price. Simply stated, the strikethrough prices only exist to create the illusion that the customer is getting a product worth more than what they are paying, at a meaningfully discounted price. That is fundamentally misleading. Based on my review of Defendant's ads, price quotes, webpages, and order confirmations Defendant constantly advertises these strikethrough list prices to all of its customers.

89.     The strikethrough price featured in many of Defendant's product specific ads, various webpages, price quotes, and order confirmations is clearly intended to communicate to customers that it is the regular price for the advertised product. Ordinary consumers understand a strikethrough price to be a product's regular price; the price that consumers typically must pay to buy the product and that most people pay to buy the product. But once again, this is not true because Defendant's products are rarely if ever sold at that price and instead are always available for, and sold at in the overwhelming

---

[30] Dominick, 97:13-98:9.

majority of cases, at least 15%-20% less; and the resultant purported discount price is not a discount at all.

90.    Showing customers strikethrough prices is not an uncommon practice used by advertisers to demonstrate the disparity between the discount price and a regular price for an item, or their former price. But in this instance, Defendant's strikethrough price is meaningless – it is just there for show. Therefore, in my opinion a reasonable consumer would be deceived and misled by Defendant's advertisements. Consumers believe and expect that they are getting product worth the advertised list price, when in fact they are getting a product worth 15-20% less. Said differently, consumers believe and expect that they are getting a discount worth at least 15-20% of the purchase price, when in fact they are getting a much smaller discount worth much less, or, in many cases, no discount at all. Customers would not be getting the deal they believed they were getting by taking advantage of Defendant's purported discounts. Rather, they were paying the full, regular price (or a much smaller discount) and not getting the deal they believed they were getting.

91.    In my experience, customers hate to be misled, especially about discount deals.

92.    It should be noted that regardless of how consumers interacted with The Shade Store – be it by accessing its website and online store or dealing personally with one of its Design Consultants by phone or chat or in a retail setting, its misleading promotional methodology was consistently applied. Defendant's supposed list prices and discounts were consistently displayed on Defendant's website for consumers who bought on the online store; and consistently displayed on price quotes for those who bought through

design consultants.[31] Pricing was based on fictitious regular prices that seem to have existed solely to dramatically calculate a discounted sale price, and in any event were not the regular prices of the products.

93. Defendant employs the same misleading tactics (i.e., advertising fake discounts using fake regular prices) with Defendant's trade customers (e.g., interior designers, et al.). The same fake regular price (i.e., the strikethrough price) that ordinary consumers saw on Defendant's website or in consumers' price quotes were also used to calculate trade customers' trade discount.

94. It has been my experience that most businesses regard trade customers as their best customers because they buy in volume, are repeat customers, and are familiar with the purchase process, which expedites closing the sale. They are given preferred status, which includes getting "the best deal" offered by the seller. So when trade customers are offered a discount, that discount is typically a "true" discount, off of "true" regular prices that consumers typically pay.

95. Mr. Robert Smith is one of the Plaintiffs in this matter and a Shade Store trade customer. He received quotes for a number of roller shade products after visiting a Shade Store brick-and-mortar showroom in 2021. The quote for one of the products in his purchase is illustrated on the following page (Figure 10). As stated on the quote, Mr. Smith's trade discount was 30 percent.[32]

---

[31] Dominick, 79:24-82:5.
[32] TSS0039303.



*Figure 10. TSS0039303.*

96. Therefore, Mr. Smith undoubtedly believed that the price he paid was 30% off the regular price of each roller shade in his order (i.e., the price that people who do not enjoy a trade discount typically pay, most of the time, for the products in question). This is what any reasonable customer would assume. But as previously discussed, the regular price was a fictional price that existed only to be used to calculate the supposedly discounted price the customer would be charged. At the time Mr. Smith placed his order, Defendant was running one of its ongoing 20% Off Sitewide Sales. So Mr. Smith's 30-percent discount was illusory; he was not receiving a 30-percent discount because the true regular prices of the products he purchased were actually 20% lower than the prices Defendant advertised.

97. I have also learned that in certain circumstances a "promotional discount code" is used to determine the sale price of a product. At his deposition Defendant's Field Vice President of Sales, Jorge Mendoza, testified that if a sitewide promotion is running,

any promo code applied to a consumer's order would be for more of a discount than the sitewide promotion.[33] But Mr. Mendoza also made it clear that the starting point for the price calculation would be the ersatz regular price.

98.     So even in instances where a promotional code is used to help determine the price, the misleading methodology of basing the discount on a fictional regular price is employed; i.e., in price quotes, the final price is compared to the fictional regular price. This practice deceives customers, regardless of whether those customers received the reoccurring sitewide discount, a discount through a promotional code, or a trade discount.

## IX. A REASONABLE CUSTOMER WOULD RELY ON THE VERACITY OF DEFENDANT'S PRICE-OFF MESSAGING, i.e., THAT THE SALE PRICE IS TRULY LESS THAN THE REGULAR PRICE

99.     In my experience, while customers do not always trust product attribute or benefit claims in advertising, they do believe that the advertised price of a product, or an advertised discount for a product on sale, is true. That is because such advertisements are common and most advertisers actually deliver on those messages.

100.     I also am of the opinion that most consumers reasonably assume that the expiration dates of sale events are for real. As a matter of policy, my supermarket clients did not accept price-off coupons that had expired. My ocean cruise line clients did not extend the sales price of a given itinerary to prospective customers once the expiration date of the promotional rate had passed. My Baskin-Robbins client did not extend its season kick-off "Free Scoop Day" promotion to the day after the one-day promotion. Because

---

[33] Deposition of Jorge Mendoza, 10/22/2024, 138:12-25.

businesses usually enforce sale expiration dates, consumers reasonably take those expiration dates at face value.

101.    Consumers are particularly likely to believe the messages that large, well-branded companies communicate. And The Shade Store falls into that category. Established in 1945, the company operates more than 150 showrooms with multiple locations in major metropolitan markets such as Austin, Atlanta, Boston, Chicago, Dallas/Ft. Worth, Denver, Detroit, Houston, Los Angeles, Phoenix/Scottdale, Miami, Nashville, New York, San Diego, San Francisco, Seattle and Washington DC.[34] And, of course, its reach is national via its theshadestore.com website and online store.

102.    In my opinion customers do not (and should not be required to) act as "Deceptive Sale Detectives." A reasonable consumer would not (and should not be expected to) constantly monitor Defendant's website (or its showrooms) to try to determine if the sale price he or she paid was really a discounted price or rather, a camouflaged (by labeling it a sale price) regular price. A permanent sale is not a sale. And sales prices that are based on fictitious regular prices are not legitimate, either. Customers should not have to try to figure that out.

*    *    *

103.    The opinions I have expressed herein are offered to a reasonable degree of certainty based on my experience as an advertising professional. I reserve the right to amend this report if I am provided with additional evidence obtained through discovery or otherwise, or if any expert witness report is received and/or any related deposition taken.

---

[34] theshadestore.com, accessed 1/21/2025.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23rd day of January 2025 in Studio City, California.

_____
Bruce G. Silverman

# EXHIBIT "A"

# EXHIBITS AND OTHER MATERIAL REVIEWED

**Court Documents**

Plaintiffs' Third Amended Complaint (Northern District of California)

Plaintiffs' Second Amended Complaint (Western District of Washington)

Stipulated Protective Order (signed)

**Evidence of Sale Pricing**

TSS0006135

TSS0006170

TSS0006195

TSS0006216

TSS0008879

TSS0011882

TSS0012125

TSS0012144

TSS0012284

TSS0038115

TSS0038338

TSS0039303

TSS0012125

TSS0012144

TSS0039303

TSS0039289

**Plaintiff Depositions**

Amanda Goldwasser

Joel Lumian

Katherine Jane Adler

Lee Fitzgerald

Mark Melvin Elkins

Robert Smith

Sharon Crowder

**Defendant Depositions**

Jorge Mendoza

Suzanne Dominick


**Plaintiff Expert Report**

Colin Weir


**Academic Articles**

Grewal - Comparative Price Advertising (1992)

Staelin et al. - Competition and the Regulation of Fictitious Pricing (2023)


Internet URLs as cited in text

# EXHIBIT "B"

| May 2005 – Present | **SILVERMAN CONSULTING LLC (Los Angeles)**<br>**Principal** |
|---|---|
| | Advertising and branding consultant to advertisers and advertising agencies in the U.S., Europe and Asia engaged in marketing consumer goods and services. Consultant and expert witness for law firms throughout the U.S. and U.K. on cases where false/misleading advertising, trademark infringement, advertising industry custom and practice, publicity rights and/or media are at issue. |
| January 2003 – April 2005 | **WONG DOODY ADVERTISING (Los Angeles)**<br>**President and Partner** |
| | Privately-owned, award-winning advertising agency with offices in Los Angeles and Seattle. Clients included Alaska Airlines, Alpine Electronics, Autodesk, Clif Bar, Los Angeles Dodgers, MGM Home Entertainment, Sony Pictures, UCLA/Anderson School of Management. |
| March 1997 – Dec. 2002 | **INITIATIVE PARTNERS (Los Angeles)**<br>**President/CEO; Member, Initiative Worldwide Board**<br>**of Directors** |
| | Principal U.S. unit of world's largest ($22BB+) advertising media planning and buying agency. Clients included Acura, Albertson's, Arco, Carl's Jr/Hardee's, Baskin-Robbins, Chevrolet, Cisco Systems, Intel, Walt Disney Company, E*Trade, The Home Depot, Johnson & Johnson, Kaiser-Permanente, Six Flags, Taco Bell, U.S. Navy Recruiting Command, Unilever, plus more than 100 advertising agencies operating throughout the United States and Canada. |

| | |
|---|---|
| January 1986 – March 1997 | **ASHER/GOULD ADVERTISING, INC. (Los Angeles)**<br>**President, Chief Creative Officer, Chief Operating**<br>**Officer and Partner**<br><br>Privately-owned, top 100 advertising agency with offices in Los Angeles and Las Vegas. Clients included American Savings Bank, Avery Dennison, Baskin-Robbins, HBO, ITT/Sheraton, The Men's Wearhouse, Pabst Brewing Company, Pizza Hut, MGM Resorts, Sanyo, Southern California Cable Marketing Council, Suzuki cars and trucks, State of California Department of Health Services, SunAmerica |
| January 1984 – Dec. 1986 | **BBDO/WEST, INC. (Los Angeles, San Francisco)**<br>**Executive Vice President, General Manager, Chief**<br>**Creative Officer and Director**<br>West Coast division of Top 10 global advertising agency. Accounts included Apple Computer International, Coldwell Banker, HBO, Hughes Supermarkets, Pepsi, PIP Printing, Sanyo/Fisher, Sebastiani Vineyards, Sizzler, Southern California Dodge Dealers, Union Bank |
| January 1981 – Dec. 1983 | **BOZELL & JACOBS, SOUTHWEST, INC. (Dallas)**<br>**Executive Vice President, Chief Creative Officer**<br>Southwest division of Top 10 U.S. advertising agency. Accounts included American Airlines, Armour Foods, Avis, Greyhound, Mary Kay Cosmetics, Pace Foods, Quaker Oats, Southwestern Bell, Symantec, Zale Corporation. |
| August 1967 – Dec. 1980 | **OGILVY & MATHER, INC. (New York)**<br>**Senior Vice President, Executive Creative Director,**<br>**Member, O&M USA Council of Directors**<br>Top five global advertising agency. Executive Creative Director and General Manager, O&M Los Angeles (1977-80); Creative Director, O&M Houston (1974-77); Associate Creative Director, O&M London (1974), Associate Creative Director, O&M New York (1972-73).<br><br>Accounts included American Express, British Travel Association, Dove, French Tourism, Hershey Foods, IBM, Imperial margarine, KLM, Korean Airlines, Panasonic, Post cereals, Puerto Rico Tourism, Mattel, Maxwell House, |

MTV, Mercedes Benz, Merrill Lynch, Nabisco, Nickelodeon, Shell, Smith Barney, Trailways, TWA, Universal Studios

**EDUCATION**  June 1966 BA, Adelphi University, Garden City, New York

**INDUSTRY**  Vice Chairman, Western Region – American Association of Advertising Agencies (industry trade association) (1995-2002)

National Board of Directors – American Association of Advertising Agencies (1995-2002)

Vice President – Los Angeles Advertising Agencies Association (1995-2002)

Member, Los Angeles Advertising Club (1978-1980; 1984-2005)

Vice President – Dallas Advertising Club (1981-1983)

Vice President – Houston Advertising Federation (1975-1977

Member – The Television Academy

Director – Los Angeles Chapter, Forensic Expert Witness Association (2006-2009)

**TEACHING POSITIONS**  Instructor: Pepperdine University, UCLA Extension

Guest Instructor: Arizona State University, California State University Northridge, California State University San Diego, California State University Los Angeles, California State University San Francisco, New York University, Rice University, Southern Methodist University, Stanford University, University of Arizona, University of California (Berkeley), UCLA Anderson School of Management, UCLA Fielding School of Public Health, University of Hawaii, University of Houston, University of Southern California, University of Texas, Thunderbird School of Management; Dean's Board of Advisors, UCLA Extension

**OTHER**  Author: *How to Create Tobacco-Use Prevention Advertising That Works*; University of Florida Press, 1996

Media Appearances:  Frequent "advertising/marketing guest authority" on Bloomberg News, NBC News, ABC 20/20; cited in articles in *Wall Street Journal, New York Times, Los Angeles Times, Washington Post, USA Today, Advertising Age, AdWeek*

**AWARDS:**  Multiple Clios, One Show "Pencils," multiple Beldings, two Gold Lions at Cannes International Advertising Festival; three "Effie" awards, two David Ogilvy Awards.

**ADVERTISING/BRANDING CLIENTS SERVED (BY CATEGORY)**
**(Partial List; 1968-2023)**

| | |
|---|---|
| **Apparel/Fashion** | C&R Clothiers (Asher/Gould) |
| | Cherokee Apparel (Asher/Gould) |
| | The Men's Wearhouse (Asher/Gould) |
| | Harris & Frank Clothiers (Asher/Gould) |
| | Kennedy's Clothiers (Asher/Gould) |
| | London Fog (Asher/Gould) |
| | Mervyn's (Wong Doody) |
| | Nordstrom (Wong Doody) |
| | |
| **Automotive** | Acura (Initiative) |
| | Chevrolet (Initiative) |
| | Dodge and Dodge Dealer Associations (BBDO) |
| | Kia (Initiative) |
| | Jaguar (Bozell) |
| | Mercedes-Benz (Ogilvy) |
| | Peugeot (Ogilvy) |
| | Suzuki (Asher/Gould) |
| | |
| **Beverages** | Ballantine Ale (Asher/Gould) |
| | Brew 102 Beer (Asher/Gould) |
| | Country Club Malt Liquor (Asher/Gould) |
| | Country Time Lemonade (Ogilvy) |
| | Falstaff Beer (Ogilvy; Asher/Gould) |
| | Hamm's Beer (Asher/Gould) |
| | Mountain Dew (Ogilvy) |
| | M. LaMont Vineyards (Ogilvy) |
| | Old Crow Bourbon Whisky (Ogilvy) |
| | Olde English 800 Malt Liquor (Asher/Gould) |
| | Olympia Beer (Asher/Gould) |
| | Pabst Blue Ribbon Beer (Asher/Gould) |
| | Pearl Beer (Asher/Gould) |

|                        | Pepsi Light (Ogilvy) |
|------------------------|----------------------|
|                        | Pepsi-Cola (BBDO) |
|                        | Private Stock Malt Liquor by Haffenreffer (Asher/Gould) |
|                        | Schaeffer Beer (Ogilvy) |
|                        | Sebastiani Vineyards (BBDO) |
|                        | Stolichnaya Vodka (Ogilvy) |
|                        | Van Gogh Vodka (Wong Doody) |
|                        | Vitel Mineral Water (BBDO) |
| **Corporate**          | Autodesk (Wong Doody) |
|                        | Avery Dennison (Asher/Gould) |
|                        | Cerner Corporation (Silverman LLC) |
|                        | Cessna Citation (Ogilvy) |
|                        | Church of Jesus Christ of Latter-Day Saints (Initiative) |
|                        | City Investing (Ogilvy) |
|                        | Cooper Industries (Ogilvy) |
|                        | Dresser Industries (Ogilvy) |
|                        | IBM (Ogilvy) |
|                        | International Nickel (Ogilvy) |
|                        | International Paper (Ogilvy) |
|                        | Owens-Corning Fiberglas (Ogilvy) |
|                        | Rail LA (Silverman LLC) |
|                        | Shell Oil Company (Ogilvy) |
|                        | Worldwide Church of God (BBDO) |
| **Consumer Electronics** | Alpine Electronics (Wong Doody) |
|                        | Circuit City (Asher/Gould) |
|                        | Concord Electronics (BBDO) |
|                        | Fisher (BBDO) |
|                        | Panasonic (Ogilvy) |
|                        | Sanyo (Asher/Gould) |

| | |
|---|---|
| **Direct Response** | American Express cards (Ogilvy) |
| | Associates Financial (Bozell) |
| | Bally's Health and Fitness (Initiative) |
| | Bryman College (Asher/Gould) |
| | HBO (Asher/Gould) |
| | Intercept Program (Asher/Gould) |
| | Jenny Craig (Initiative) |
| | Kaiser/Permanente (Initiative) |
| | Law Offices of Larry H. Parker (Asher/Gould; Silverman LLC) |
| | Mobile Dynamics (Wong Doody) |
| | National Education Centers (Asher/Gould) |
| | Paintrol Clinics (Asher/Gould) |
| | Southern California Cable Marketing Council (Asher/Gould) |
| | UCLA Anderson School of Management (Wong Doody) |
| | |
| **Education** | Bryman College (Asher/Gould) |
| | Geisinger Commonwealth School of Medicine (Silverman LLC) |
| | Mobile Dynamics (Wong Doody) |
| | National Education Centers (Asher/Gould) |
| | National University (Initiative) |
| | UCLA Anderson School of Management (Wong Doody) |
| **Entertainment** | Albuquerque Studios (Silverman LLC) |
| | Big Moving Pictures (Silverman LLC) |
| | Buena Vista Pictures (Initiative) |
| | Center Theatre Group/Ahmanson Theatre; Mark Taper Forum (Initiative) |
| | Circus World (Ogilvy) |
| | Disney Home Video (Initiative) |
| | Disneyland (Initiative) |
| | Dynasty Visual Effects and Animation (Silverman LLC) |

Grand Ol' Opry (Ogilvy)

HBO (BBDO and Asher/Gould)

Houston Grand Opera (Ogilvy)

Los Angeles Dodgers (Wong Doody)

MGM Home Video (Wong Doody)

MTV (Ogilvy)

Nickelodeon (Ogilvy)

Opryland USA (Ogilvy)

Pacific Ventures (Silverman LLC)

Ringling Brothers Barnum & Bailey Circus (Ogilvy)

Six Flags (Ogilvy and Initiative)

Sony Pictures Digital Entertainment (Wong Doody)

Southern California Cable Marketing Council (Asher/Gould)

The Walt Disney Company (Initiative)

Touchstone Pictures (Initiative)

UCLA Athletics (Silverman LLC)

UPN (United Paramount Network) (Initiative)

Walt Disney Pictures (Initiative)

Walt Disney World (Initiative)

Warner Brothers  (Initiative)

World Poker Tour (Wong Doody)

**Financial Services**      Allied Bank of Texas (Bozell)

American Express Credit Cards (Ogilvy)

American Express International Bank (Ogilvy)

American Savings Bank (Asher/Gould)

Associates Financial (Bozell)

Bowery Savings Bank (Ogilvy)

E*Trade (Initiative)

Gibraltar Savings & Loan of California (Ogilvy)

Gibraltar Savings & Loan of Texas (Ogilvy)

Merrill Lynch (Ogilvy)

|  |  |
|---|---|
|  | J. P. Morgan & Co. (Ogilvy) |
|  | Nationwide Insurance (Ogilvy) |
|  | Plastic Cash International  (Wong Doody) |
|  | Republic Bank of Texas (Bozell) |
|  | Smith Barney (Ogilvy) |
|  | SunAmerica (Asher/Gould) |
|  | Union Bank of California (BBDO) |
|  | U.S. Trust (Ogilvy) |
|  | Valley National Bank – AZ (Bozell) |
|  | Wei Dong Investment Holdings Ltd. (Silverman LLC) |
| **Gaming** | Augustine Casino (Wong Doody) |
|  | Bellagio Hotel & Casino (Initiative) |
|  | California Lottery (Initiative) |
|  | Desert Inn Hotel & Casino (Asher/Gould) |
|  | Las Vegas Convention and Visitor's Authority (Initiative) |
|  | MGM Grand Hotel & Casino (Asher/Gould) |
|  | Mirage Hotel & Casino (Initiative) |
|  | New York New York Hotel & Casino (Asher/Gould) |
|  | Treasure Island Hotel & Casino (Initiative) |
| **Grocery Products (includes. Packaged Goods)** | Armour Dinner Classics (Bozell) |
|  | Armour Hot Dogs (Bozell) |
|  | Armour Deli Meats (Bozell) |
|  | Balance Bar (Initiative) |
|  | Beijing Zhong Gao International HR Co. Ltd. (Silverman LLC) |
|  | California Avocados (Asher/Gould) |
|  | California Eggs (Asher/Gould) |
|  | Clif Bar (Wong Doody) |
|  | Conagra Foods (Bozell) |
|  | Gaines (Ogilvy) |
|  | Dove Liquid (Ogilvy) |

Enfamil infant formula (Ogilvy)

Heath Bars (Bozell)

Hershey (Ogilvy)

Imperial Margarine (Ogilvy)

Luna Bar (Wong Doody)

Nabisco Double Stuf (Ogilvy)

Nabisco Krazy Glazy (Ogilvy)

Nabisco Premium Saltine Crackers (Ogilvy)

Nabisco Sooper Kookies (Ogilvy)

Pace Picante Sauce (Bozell)

Pepperidge Farm (Ogilvy)

Post Alpha-Bits (Ogilvy)

Post Cocoa Pebbles (Ogilvy)

Post Fruity Pebbles (Ogilvy)

Post Super Sugar Crisp (Ogilvy)

Purina Dog Chow (Ogilvy)

Quaker Oats (Bozell)

Quaker Chewy Granola Bars (Bozell)

Quaker Masa Harina (Bozell)

Quaker 100% Natural Cereal (Bozell)

Ralston-Purina Cookie Crisp cereal (Ogilvy)

Reese's Peanut Butter Cups (Ogilvy)

Swanson Frozen Dinners (Ogilvy)

**Health & Beauty Aids**     Avon Cosmetics (Ogilvy)

Contac (Ogilvy)

Dove Beauty Bar (Ogilvy)

Kinerase (Wong Doody)

Mary Kay Cosmetics (Bozell)

Mead-Johnson Enfamil (Ogilvy)

Mead-Johnson Metrecal (Ogilvy)

Pears Soap (Ogilvy)

Rembrandt Whitening Toothpaste (Wong Doody)

Twice as Nice shampoo (Ogilvy)

| | |
|---|---|
| **Healthcare** | Cedars-Sinai Health System (Silverman LLC) |
| | Century Aesthetics (Silverman LLC) |
| | Century City Doctors Hospital (Silverman LLC) |
| | Contac Cold and Flu medicine (Ogilvy) |
| | Cerner Corporation (Silverman LLC) |
| | Doctor Campbell Credit Dentists (Asher/Gould) |
| | Geisinger Health (Silverman LLC) |
| | Intercept Program (Asher/Gould) |
| | Kaiser Permanente (Initiative) |
| | Modern Diagnostics (Silverman LLC) |
| | Paintrol Clinics (Asher/Gould) |
| | Private Health Management (Silverman LLC) |
| | Salus Surgical Centers (Silverman LLC) |
| | UCLA Health System (Silverman LLC) |
| | United Health Plan (Asher/Gould) |
| | Virginia Mason Medical Center (Wong Doody) |
| **Hi-Tech** | Apple Computers/International (BBDO) |
| | Autodesk (Wong Doody) |
| | Cadforce (Silverman LLC) |
| | Cerner Corporation (Silverman LLC) |
| | Cisco (Initiative) |
| | Compaq (Ogilvy) |
| | Gateway (Initiative) |
| | IBM (Ogilvy) |
| | Intel (Initiative) |
| | Symantec (Bozell) |
| **Industrial** | Cessna (Ogilvy; Bozell) |
| | International Nickel (Ogilvy) |
| | International Paper (Ogilvy) |
| | Dresser Industries (Ogilvy) |

| | |
|---|---|
| | Falcon Waterfree (Silverman LLC) |
| | Owens-Corning Fiberglas (Ogilvy) |
| | Shell Farm Chemicals (Ogilvy) |
| | Shell Industrial Chemicals (Ogilvy) |
| | Shell Plastics, Resins and Synthetic Rubber (Ogilvy) |
| **Internet** | America On-Line (Initiative) |
| | E-Trade On-Line (Initiative) |
| | Event 411.com (Initiative) |
| | Petstore.com (Initiative) |
| | PlasticCash.com (Wong Doody) |
| | Yahoo! (Initiative) |
| **Marketing Communications Agencies** | Ayzenberg (Silverman LLC) |
| | Beijing Reach-All Investment Company Ltd. (Silverman LLC) |
| | BH Direct (Silverman LLC) |
| | Bright Strategic Design (Silverman LLC) |
| | Bullpen Integrated Marketing (Silverman LLC) |
| | Donnenfeld & Associates (Silverman LLC) |
| | Eclipse Studio, Beijing (Silverman LLC) |
| | Glyphix (Silverman LLC) |
| | Horizon Media (Silverman LLC) |
| | M Creative Group (Silverman LLC) |
| | Nice Advertising (Silverman LLC) |
| | The Phelps Group (Silverman LLC) |
| | Radarworks (Silverman LLC) |
| | Rogers & Associates (Silverman LLC) |
| | Schiller LLC (Silverman LLC) |
| | U.S. International Media (Silverman LLC) |
| | The Woo Agency (Silverman LLC) |
| **Media/Publishing** | 24/6 Media dba Pocket Billboards (Silverman LLC) |
| | Bulzi (Silverman LLC) |

The Equestrian News (Silverman LLC)

Frontiers Media LLC (Silverman LLC)

HBO (BBDO and Asher/Gould)

KCAL 9 Television (Initiative)

Sirius XM (Silverman LLC)

Southern California Cable Marketing Council (Asher/Gould)

Triton Media (Silverman LLC)

UPN (United Paramount Network) (Initiative)

**Miscellaneous Products**
Paragon Luggage (Wong Doody)

Steuben Glass (Ogilvy)

Zippo (Ogilvy)

**Office Products**
Avery Dennison (Asher/Gould)

Intuit – QuickBooks (Wong Doody)

**Petroleum Products**
Arco (Initiative)

Shell Fire & Ice Motor Oil (Ogilvy)

Shell Gasoline (Ogilvy)

**Professional Services**
Cadforce (Silverman LLC)

CFO911 (Silverman LLC)

Law Offices of Larry H. Parker, Inc. (Asher/Gould; Silverman LLC)

Perona, Langer, Beck Inc. (Silverman LLC)

**Real Estate**
Coldwell Banker (BBDO)

Esprit (Silverman LLC)

Move.com (Silverman LLC)

Pacifica Ventures (Silverman LLC)

Relocation.com (Silverman LLC)

Waterwood (Ogilvy)

The Woodlands (Ogilvy)

**Restaurants**
Acapulco (Asher/Gould)

Baskin-Robbins (Ogilvy; Asher/Gould)

Bennigan's (Bozell)

Burger Chef (Ogilvy)

Carl's Jr. (Initiative)

Der Weinerschnitzel (Initiative)

Godfather's Pizza (Bozell)

Hardee's (Initiative)

KFC (Initiative)

Packard's Grill (Asher/Gould)

Pioneer Chicken (Asher/Gould)

Pizza Hut (Asher/Gould)

Sizzler (BBDO)

Steak & Ale (Bozell)

Taco Bell (Initiative)

Togo's (Initiative)

Tom Sawyer's Old Fashioned Fried Chicken (Ogilvy)

**Retail**           Aaron Brothers Art Marts (Asher/Gould)

Albertson's Supermarkets (Initiative)

Arco (Initiative)

Bailey Banks & Biddle Jewelers (Bozell)

Big Lots (Initiative)

C&R Clothiers (Asher/Gould)

Checker Auto Parts (Bozell)

Circle K (Initiative)

Circuit City (Asher/Gould)

Factory2You Stores (Asher/Gould)

Family Bargain Center Stores (Asher/Gould)

Fry's Supermarkets (Initiative)

Harris & Frank Clothiers (Asher/Gould)

Hughes Supermarkets (BBDO)

Kennedy's Clothiers (Asher/Gould)

Men's Wearhouse (Asher/Gould)

Mervyn's (Wong Doody)

Nordstrom (Wong Doody)

Osco Drugs (Initiative)

Puppy Palace (Ogilvy)

PIP Printers (BBDO)

Ralphs Supermarkets (Initiative)

Safeway Supermarkets (Initiative)

Sainsbury Supermarkets (Silverman LLC)

Sav-On Drugs (Initiative)

Sears (Ogilvy)

Sit 'n Sleep (Silverman LLC)

Stater Brothers Supermarkets (Initiative)

Steuben Glass (Ogilvy)

The Home Depot (Initiative)

Tesco Supermarkets (Silverman LLC)

Tom Thumb Supermarkets (Bozell)

Vons Supermarkets (Initiative)

Wherehouse Records & Tapes (Asher/Gould)

Zale Jewelers (Bozell)

**Social Marketing**
California Department of Health Services – BabyCal (Asher/Gould)

California Department of Health Services – First5 (Asher/Gould)

California Department of Health Services – HIV Prevention (Asher/Gould)

California Department of Health Services – Tobacco-Use Prevention (Asher/Gould)

Los Angeles County Department of Public Health – Tobacco-Use Prevention (Asher/Gould)

Oregon Health Department – Tobacco-Use Prevention (Asher/Gould)

United States Department of Commerce, Census 2000 (Initiative)

United States Government; Centers for Disease

| | |
|---|---|
| | Control – Tobacco-Use Prevention (Initiative) |
| | White House office of National Drug Control Policy – Drug-use Prevention (Initiative) |
| **Telecommunications** | Nextel (Initiative) |
| | Telcentris (Silverman LLC) |
| | Southwestern Bell (Bozell) |
| | VoxOx (Silverman LLC) |
| **Tobacco** | Tijuana Smalls (Ogilvy) |
| **Tires/Batteries/ Accessories** | Arco (Initiative) |
| | Goodyear (Ogilvy) |
| | Shell (Ogilvy) |
| **Toys/Games** | Electronic Arts (Initiative) |
| | Mattel Electronics (Ogilvy) |
| | Mattel Toys and Games (Ogilvy) |
| **Travel/Tourism** | Alaska Airlines (Wong Doody) |
| | Alaska Tourism (Initiative) |
| | ALM Royal Dutch Airlines (Ogilvy) |
| | American Airlines (Bozell; Initiative) |
| | American Express Travel Service (Ogilvy) |
| | Avis Rent-a-Car (Bozell) |
| | Bellagio Hotel & Casino (Initiative) |
| | British Tourist Authority (Ogilvy) |
| | Cunard Lines (Ogilvy) |
| | Desert Inn Hotel & Casino (Asher/Gould) |
| | Disney Cruise Lines (Initiative) |
| | Disneyland and Walt Disney World (Initiative) |
| | French Government Tourist Office (Ogilvy) |
| | Greyhound Lines (Bozell) |
| | Hyatt Regency Maui (Ogilvy) |
| | Hyatt Regency Waikiki (Ogilvy) |
| | Hyatt Kuilima Resort (Silverman LLC) |

KLM Royal Dutch Airlines (Ogilvy)

Korean Airlines (Ogilvy)

Las Vegas Convention & Visitors Bureau (Initiative)

Loreto Bay (Wong Doody)

Marriott (Ogilvy)

MGM Grand Hotel & Casino (Asher/Gould)

Mirage Hotel & Casino (Initiative)

New York New York Hotel & Casino (Asher/Gould)

Opryland USA (Ogilvy)

Six Flags (Ogilvy and Initiative)

Trailways Bus Lines (Ogilvy)

Treasure Island Hotel & Casino (Initiative)

TWA (Ogilvy)

United States Travel Authority (Ogilvy)

Universal Studios Hollywood (Ogilvy)

Yosemite National Park and the Curry Company (Ogilvy)

**Utilities**

Bell South (Initiative)

Houston Lighting & Power (Ogilvy)

Nextel (Initiative)

Salt River Project (Bozell)

Southwestern Bell (Bozell)

# EXHIBIT "C"

# EXPERT WITNESS EXPERIENCE

## DEPOSITION, ARBITRATION AND/OR TRIAL TESTIMONY

(2021-2025; Underscore indicates client)


*NEA VIZCARRA, et al. v. MICHAELS STORES, INC.*
United States District Court, Northern District Of California
Case No. 3:23-cv-00468-PCP
Deposed 1/14/2025

*SARA SAFARI et al. v. WHOLE FOODS MARKET SERVICES, INC., et al.*
United States District Court, Central District of California, Southern Division
Case No. 8:22-CV-01562 JWH-KES
Deposed 1/8/2025

*JENNIFER VLACICH et al. v. DEL MONTE FOODS*
United States District Court, Northern District of California,
Case No. 4:22-cv-00892-JST
Deposed 10/21/2024

*CHARLOTTE WILLOUGHBY et al. v. ABBOTT LABORATORIES*
United States District Court, Northern District Of Illinois, Eastern Division
Case No. 1:22-CV-01322
Deposed 5/14/2024.

*IN THE MATTER OF CERTAIN BLOOD FLOW RESTRICTION DEVICES WITH ROTATABLE WINDLASSES AND COMPONENTS THEREOF*
(On behalf of Complainant)
U.S. International Trade Commission
ITC Inv. No. 337-TA-1364
Deposed 12/19/2023.

*Q INDUSTRIES, INC., v. O'REILLY AUTOMOTIVE, INC., et al.*
United States District Court, Central District of California
Case No.: 2:22-cv-03791-AB-PVCx
Deposed 12/6/2023

*WORLD CHAMP TEC LLC, v. PELOTON INTERACTIVE, INC.*
United States District Court, Northern District of California
Case No. 4:21-cv-03202 SBA
Deposed 3/14/ 2023

*IN RE PLUM BABY FOOD LITIGATION*
(On behalf of Plaintiffs)
United States District Court, Northern District of California, Oakland Division
Case No. 21-cv-00913-YGR
Deposed 3/3/2023

<u>*UNIMED INTERNATIONAL, INC.,*</u> *v. FOX NEWS NETWORK, LLC.*
United States District Court, District of New Jersey
Case No. 2:20-cv-17335-SDW-LDW
Deposed 12/14/2022

<u>*PEOPLE OF THE STATE OF CALIFORNIA*</u> *v. HOMEADVISOR, INC. and ANGI HOMESERVICES, INC.*
Superior Court of the State of California, City and County of San Francisco
Case No. CGC-18-565008
Deposed 10/11/2022

<u>*DIANA DUKICH et al.*</u> *v. IKEA US RETAIL LLC and IKEA NORTH AMERICA SERVICES, LLC*
United States District Court for the Eastern District of Pennsylvania
Case No. 2-20-cv-2182-HB
Deposed 6/15/2022

<u>*COURT THOMAS, IN HIS CAPACITY AS RECEIVER AND AS ASSIGNEE*</u>*, v. SALEM MEDIA GROUP, INC., MARK DAVIS, INSPIRATION MEDIA OF TEXAS, LLC, AND BISON MEDIA, INC.*
County Court at Law No. 3, Dallas County, Texas
Cause No. CC-20-01021-C
Deposed 6/6/2022

*IN THE MATTER OF IN RE: ROCK 'N PLAY SLEEPER MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION*
(On behalf of Plaintiffs)
United State District Court, Western District of New York
Case No: MDL No. 1:19-md-2903.
Deposed 10/28/2021

<u>*JOSEPH MIER, et al*</u>*. v. CVS PHARMACY, INC.*
United States District Court
Central District of California
Case No. 8:20-cv-01979-DOC-ADS
Deposed 10/14/2021

*JEFFEY KOENIG and MARCELLUS HOLT, et al. v. VIZIO, INC.*
Superior Court of the State of California, County of Los Angeles
Case No: BC702266
Deposed 10/8/2021

*CHRISTOPHER JULIAN et al. v. TTE TECHNOLOGY, INC. DBA TCL NORTH AMERICA*
United States District Court, Northern District of California
Case No: 3:20-CV-028570-EMC
Deposed 9/30/2021

*AFSHIN ZARINEBAF et al. v. CHAMPION PETFOODS, et al.*
United States District Court, Northern District of Illinois, Eastern Division
Case No. 1:18-cv-06951
Motion Hearing 9/22/2021

*CARROLL SHELBY LICENSING, INC., and the CARROLL HALL SHELBY TRUST v. DENICE SHAKARIAN HALICKI, ELEANOR LICENSING, LLC, GONE IN 60 SECONDS MOTORSPORTS, LLC, et al.*
United States District Court, Central District of California
Case No. 8:20-cv-01344-MCS-DFMx
Deposed 8/24/2021

*DELANEY SHARPE et al. v. GT'S LIVING FOODS, LLC.*
United States District Court, Central District of California
Case No. 2:19-CV-10920-FMO-GJS
Deposed 6/8/2021

*TOYA EDWARDS et al. v. WALMART, INC.*
United States District Court, Central District of California
Case No. 2:18-cv-9655 GW-FFM
Deposed 5/11/2021

*JUSTIN LYTLE et al. v. NUTRAMAX LABORATORIES, INC., et al.*
United States District Court, Central District of California
Case No. 5:19-cv-00835-JBG-SP
Deposed 3/31/2021

*REMY SHAKER et al*. *v. CHAMPION PETFOODS USA, et al.*
United States District Court for the Eastern District of Michigan
Case No. 2:18-cv-13603-LJM-DRG

     and,

*RACHEL COLANGELO et al. v. CHAMPION PETFOODS USA, et al.*
United States District Court, Northern District of New York
Case No. 6:18:CV-01228-LEK-DEP

     and,

*AFSHIN ZARINEBAF et al. v. CHAMPION PETFOODS, et al.*
United States District Court, Northern District of Illinois, Eastern Division
Case No. 1:18-cv-06951
Deposed for three cases above, 3/11/2021